# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RON BUKER, Individually and On Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| L&L ENERGY, INC., DICKSON V. LEE, IAN G. ROBINSON, and CLAYTON FONG, | **JURY TRIAL DEMANDED** |
| Defendants. | |

*(stamp: RECEIVED SEP 23 2013 U.S.D.C. S.D.N.Y. CASHIERS)*

Plaintiff Ron Buker ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his Class Action Complaint against defendants, alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things: a review of the defendants' public documents; conference calls and announcements made by defendants; Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding L&L Energy, Inc. ("L&L" or the "Company"); securities analysts' reports and advisories about the Company; and information readily obtainable on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities fraud class action on behalf of all persons or entities who purchased or otherwise acquired the securities of L&L during the period from September 11, 2012 through and including September 18, 2013 (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). This class action is

brought under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a); and SEC Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company improperly accounted substantial revenue from operations that were already shut down; (2) the Company claimed acquisitions and divestitures of various properties through swap transactions that never occurred through the exchange of assets it never owned in the first place; (3) the Company lacked adequate internal and financial controls; and (4) that, as a result of the foregoing, the Company's financial results were materially false and misleading at all relevant times.

3.     On September 19, 2013, GeoInvesting published an article on Seeking Alpha disclosing that the Company has been "defrauding investors by booking substantial revenue from operations that have been idled for quite some time." Specifically, GeoInvesting stated that the Company's numerous acquisitions and divestitures through the years have amounted "to a bait and switch shell game" by utilizing "swap transactions that never occurred." Moreover, the article concluded "that revenue of $77.6 million disclosed in LLEN's 2013 10K, generated from its Hong Xing coal washing factory, was actually close to zero, if it is not actually zero" as the factory "has been shut down since 2012."

4.     On this news, the Company's stock plummeted $0.80 per share or more than 38%, to close at $1.27 on September 19, 2013.

5.     As a result of defendants' wrongful acts and omissions, and the precipitous declines in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

6.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

8.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  During the Class Period, L&L's shares traded on the NASDAQ, an exchange located within this District.

9.     In connection with the challenged conduct, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

10.     Plaintiff as set forth in the accompanying certification, incorporated by reference herein, purchased L&L securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

11.     Defendant L&L is a Nevada corporation with its principal executive offices located at 130 Andover Park East, Suite 200, Seattle, Washington 98188.  L&L acquires, invests

in and operates growing energy entities and coal mines in the People's Republic of China ("China"). L&L's common stock is listed on the Nasdaq Global Market ("NASDAQ") under the ticker "LLEN".

12.     Defendant Dickson V. Lee ("Lee") was, at all relevant times, the Company's Founder, Chairman and Chief Executive Officer ("CEO").

13.     Defendant Ian G. Robinson ("Robinson") was, at all relevant times, the Company's Chief Financial Officer and Chief Accounting Officer.

14.     Defendant Clayton Fong ("Fong") was, at all relevant times, the Company's Executive Vice President of U.S. Operations.

15.     The defendants referenced above in ¶¶ 12 - 14 are collectively referred to herein as the "Individual Defendants."

**SUBSTANTIVE ALLEGATIONS**

**Background**

16.     L&L formerly known as L&L International Holdings, is a coal-mining company founded in 1995. L&L purports, through its subsidiaries, to engage in coal mining, clean coal washing, coal coking, and coal wholesaling businesses in China. The Company's coal products include washed coal and metallurgical coke used primarily for steel manufacturing.

**Defendants' False and Misleading Statements**

17.     On September 10, 2012, after the market closed, L&L issued a press release announcing its financial results for the first quarter ended July 31, 2012. For the quarter, the Company reported net income of $8.5 million, or $0.17 diluted earnings per share ("EPS") and net revenues of $45.3 million, as compared to net income of $3.1 million, or $0.08 diluted EPS and net revenues of $36.1 million for the same period of the prior year.

4

18.     On September 10, 2012, the Company filed a quarterly report on Form 10-Q for the first quarter ended July 31, 2012 with the SEC, which was signed by Defendant Lee, and reiterated the Company's previously announced financial results and financial position.   In addition, pursuant to Sarbanes-Oxley Act of 2002 ("SOX"), the Form 10-Q contained signed certifications by Defendants Lee and Robinson, stating that the financial information contained in the 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

19.     The Form 10-Q stated the following in relevant part:

On March 15, 2011, the Company entered into an Acquisition Agreement to acquired 60% equity of the DaPing Coal Mine ("DaPing"), with an effective date of March 15, 2011, for a purchase price of 112,080,000 RMB (equivalent to approximately US$17,064,815).An initial installment of 10,000,000 RMB (equivalent to US$1,592,686) had been paid as of July 31, 2012. The remaining balance of 102,080,000 RMB is to be paid based on the achievement of several requirements by the Company and DaPing, which were met during the year-ended April 30, 2012. After meeting five requirements, 30% of the total purchase price, RMB33,624,000 (equivalent to US$5,355,249) should be paid. The remaining balance of 68,456,000 RMB (equivalent to US$10,902,894) is payable after meeting another 3 requirements subsequent. As of July 31, 2012, the remaining balance of approximately US$15 million is payable since the first 5 requirements haven't been fully met. The Company paid the $1,676,307 of the total amount of purchase price in the period ended July 31, 2012.

                    *        *        *

Sale of Ping Yi Mine

With consideration of several factors including continuing development strategies, the Company made the determination to dispose of the Ping Yi Mine. On April 30, 2012, the Company entered into an Equity Sale and Purchase Agreement with Mr. Zhang, the previous owner of Ping Yi Mine, whereby the company sold its 100% equity ownership interest in Ping Yi Mine for RMB 196,000,000, approximately $31,000,000. The payment was agreed to take the form of receipt with payment in two parts, (1) through receipt of coal extracted from Ping Yi Mine subsequent to the disposal, including priority receipt of future coal from Ping Yi mine at a 5% discounted price compared to the market price until 70% of the payment is received; (2) through receipt of the use of Ping Yi Mine's washing facilities subsequent to disposal, including usage fees charged at a 3%~5% discounted price compared to the market price until 30% of the

payment is received. The terms of the agreement state that full payment must be received within five years, and that 70% of total receipts must occur by the end of year three. As of July 31, 2012, the Company received total payment of 869,374, which $825,155 as prepayment of raw coal and 44,219 as coal washing facilities service.

20.     On December 10, 2012, the Company issued a press release announcing its financial results for the second quarter ended October 31, 2012. For the quarter, the Company reported net income of $10.8 million, or $0.21 diluted EPS and net revenues of $45.5 million, as compared to net income of $5.3 million, or $0.11 diluted EPS and net revenues of $29.5 million for the same period of the prior year.

21.     On December 10, 2012, the Company filed a quarterly report on Form 10-Q for the second quarter ended October 31, 2012 with the SEC, which was signed by Defendant Lee, and represented the Company's quarterly financial results and financial position. In addition, pursuant to SOX, the Form 10-Q contained signed certifications by Defendants Lee and Robinson, stating that the financial information contained in the 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

22.     The Form 10-Q stated the following in relevant part:

On March 15, 2011, the Company entered into an Acquisition Agreement to acquired 60% equity of the DaPing Coal Mine ("DaPing"), with an effective date of March 15, 2011, for a purchase price of 112,080,000 RMB (equivalent to approximately US$17,064,815). The Company had effective control of Da Ping since right after the signing of the Acquisition Agreement on March 15, 2011. An initial installment of 10,000,000 RMB (equivalent to US$1,592,686) had been paid as of July 31, 2012. The remaining balance of 102,080,000 RMB is to be paid based on the achievement of several requirements by the Company and DaPing. After meeting five requirements, 30% of the total purchase price, RMB33,624,000 (equivalent to US$5,355,249) should be paid. The remaining balance of 68,456,000 RMB (equivalent to US$10,902,894) is payable after meeting another 3 requirements subsequent. As of October 31, 2012, the remaining balance of approximately US$11.7 million is payable since the first 5 requirements haven't been fully met. The Company paid the $6,018,817 of the total amount of purchase price in the period ended October 31, 2012.

*    *    *

Sale of Ping Yi Mine

With consideration of several factors including continuing development strategies, the Company made the determination to dispose of the Ping Yi Mine. On April 30, 2012, the Company entered into an Equity Sale and Purchase Agreement with Mr. Zhang, the previous owner of Ping Yi Mine, whereby the Company sold its 100% equity ownership interest in Ping Yi Mine for RMB 196,000,000, approximately $31,000,000. The payment was agreed to take the form of receipt with payment in two parts, (1) through receipt of coal extracted from Ping Yi Mine subsequent to the disposal, including priority receipt of future coal from Ping Yi mine at a 5% discounted price compared to the market price until 70% of the payment is received; (2) through receipt of the use of Ping Yi Mine's washing facilities subsequent to disposal, including usage fees charged at a 3%~5% discounted price compared to the market price until 30% of the payment is received. The terms of the agreement state that full payment must be received within five years, and that 70% of total receipts must occur by the end of year three. As of October 31, 2012, the Company received total payment of $3,575,262 which $3,387,663 as prepayment of raw coal and $187,599 as coal washing facilities service.

The Company recorded $408,020 as income from discontinued operations for the year-ended April 30, 2012. Additionally, the Company recorded $3,183,786 of costs to dispose related to the provision of discounting the estimated receipt of the payment over the payment term (refer to Note 5 and 11). Subsequently, the Company has written back $318,378 as income related to the provision for the six months ended October 31, 2012.

On October 26, 2012, the Company decided to proceed with the Sales and Purchase Agreement with Union Energy for Luozhou and Lashu mines located in the Guizhou Province, China. This transaction was then completed on November 18, 2012.

Under the Agreement, the Company acquired 95% of both Luozhou and Lashu mines from Union Energy for $37.1 million. This payment was satisfied by a cash outlay of approximate $1.7 million and transfers of the Company's interests in Zonelin Coking Plant (98%) and the DaPing Mine (60%).

23.     On March 11, 2013, L&L issued a press release announcing its financial results for the third quarter ended January 31, 2013. For the quarter, the Company reported net income of $18.8 million, or $0.42 diluted EPS and net revenues of $59.9 million, as compared to net

income of $4.9 million, or $0.12 diluted EPS and net revenues of $19.4 million for the same period of the prior year.

24.     On March 11, 2013, the Company filed a quarterly report on Form 10-Q for the third quarter ended January 31, 2013 with the SEC, which was signed by Defendant Lee, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, pursuant to SOX, the Form 10-Q contained signed certifications by Defendants Lee and Robinson, stating that the financial information contained in the 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

25.     The Form 10-Q stated the following in relevant part:

On March 15, 2011, the Company entered into an Acquisition Agreement to acquired 60% equity of the DaPing Coal Mine ("DaPing"), with an effective date of March 15, 2011, for a purchase price of 112,080,000 RMB (equivalent to approximately US$17,064,815). The Company had effective control of DaPing since right after the signing of the Acquisition Agreement on March 15, 2011.

Sale of Ping Yi Mine

With consideration of several factors including continuing development strategies, the Company made the determination to dispose of the Ping Yi Mine. On April 30, 2012, the Company entered into an Equity Sale and Purchase Agreement with Mr. Zhang, the previous owner of Ping Yi Mine, whereby the company sold its 100% equity ownership interest in Ping Yi Mine for RMB 196,000,000, approximately $31,000,000. The payment was agreed to take the form of receipt with payment in two parts, (1) through receipt of coal extracted from Ping Yi Mine subsequent to the disposal, including priority receipt of future coal from Ping Yi mine at a 5% discounted price compared to the market price until 70% of the payment is received; (2) through receipt of the use of Ping Yi Mine's washing facilities subsequent to disposal, including usage fees charged at a 3%~5% discounted price compared to the market price until 30% of the payment is received. The terms of the agreement state that full payment must be received within five years, and that 70% of total receipts must occur by the end of year three. As of January 31, 2013, the Company received total payment of $5,619,088 which $5,324,718 as prepayment of raw coal and $294,370 as coal washing facilities service.

The Company recorded $408,020 as income from discontinued operations for the year-ended April 30, 2012. Additionally, the Company recorded $3,183,786 of

costs to dispose related to the provision of discounting the estimated receipt of the payment over the payment term (refer to Note 5 and 11). Subsequently, the Company has written back $477,568 as income related to the provision for the nine months ended January 31, 2013.

Sale of DaPing Coal Mine

With consideration of several factors including continuing development strategies, the Company made the determination to dispose of the DaPing Mine. On November 18, 2012, the Company decided to purchase two coal mines, which are LouZhou and LaShu mines by making a swap of the 60% equity interest in DaPing mine and 98% equity interest in ZoneLin Coking Plant. The fair value of the 60% equity interest in DaPing is reasonably stated by the amount of approximately $ 23 million, including $0.5 million on assets write-up per fair value measurement.

Sale of ZoneLin Coking Plant

With consideration of several factors including continuing development strategies, the Company made the determination to dispose of the ZoneLin Coking Plant. On November 18, 2012, the Company decided to purchase two coal mines, which are LouZhou and LaShu mines by making a swap of the 60% equity interest in DaPing mine and 98% equity interest in ZoneLin Coking Plant. The fair value of the 100% equity interest in ZoneLin is reasonably stated by the amount of RMB 77,786,000 (approximately $ 12.4 million, including $2.7 million on assets write-up per fair value measurement).

\*     \*     \*

In December 2012, China's National Policy changed to allows sole proprietorship of mines to be changed to special limited company. The Company made these changes on March 1, 2013. The name of DaPuAn Coal Mine ("DaPuAn") has been changed to Shizong HengTai Coal Mining Co., Ltd. DaPuAn Mine ("HengTaiDaPuAn"). Similarly, SuTsong Coal Mine ("SuTsong") has been changed to limited partnership structure. Under the agreements, the Company still has 80% of the equity in both of HengTai DaPuAn and SuTsong. The transactions do not impact the existing ownership of both mines by the Company.

26.     On July 30, 2013, L&L issued a press release announcing its financial results for the fiscal year ended April 30, 2013. For the year, the Company reported net income of $49.2 million, or $0.98 diluted EPS and net revenues of $199 million, as compared to net income of $19.2 million, or $0.42 diluted EPS and net revenues of $112.9 million for the same period of the prior year.

27.     On July 30, 2013, the Company filed its annual report on Form 10-K for the fiscal year ended April 30, 2013 with the SEC, which was signed by, among others, Defendants Lee and Robinson, and reiterated the Company's previously announced financial results and financial position for the fiscal year ended April 30, 2013. In addition, pursuant to SOX, the Form 10-K contained signed certifications by Lee and Robinson, stating that the financial information contained in the 10-K was accurate, and that they disclosed any material changes to the Company's internal control over financial reporting.

28.     The Form 10-K represented the following in relevant part:

We own two washing facilities with an aggregate annual coal-washing capacity of approximately 480,000 tons. The facility at Hong Xing washes coal mainly for third parties (i.e., non-affiliates to the Company.) The facility at the DaPuAn Coal mine only washes coal from the DaPuAn mine.

\*     \*     \*

Since DaPuAn only washes its own coal from its own mine, we only listed the raw coal under the Mining Segment. We have considered this is part of the total service provided within DaPuAn before the coal was sold to customer. There was no washing reported separately.

\*     \*     \*

In April 2012, we sold our interest in Ping Yi mine and coal washing plant back to the original owners. DaPuAn only washes coal from its own mine. We have considered this as part of the total service provided within DaPuAn before the coal was sold to customer. Therefore, there was no washing for DaPuAn reported separately.

\*     \*     \*

Sale of Ping Yi Mine

With consideration of several factors including continuing development strategies, the Company made the determination to dispose of the Ping Yi Mine. On April 30, 2012, the Company entered into an Equity Sale and Purchase Agreement with Mr. Zhang, the previous owner of Ping Yi Mine, whereby the company sold its 100% equity ownership interest in Ping Yi Mine for RMB 196,000,000, approximately $31,000,000. The payment was agreed to take the form of receipt with no payment in two parts, (1) through receipt of coal extracted from Ping Yi Mine subsequent to the disposal, including priority receipt of future coal from Ping Yi mine at a 5% discounted price compared to the market price

until 70% of the payment is received; (2) through receipt of the use of Ping Yi Mine's washing facilities subsequent to disposal, including usage fees charged at a 3%~5% discounted price compared to the market price until 30% of the payment is received. The terms of the agreement state that full payment must be received within five years, and that 70% of total receipts must occur by the end of year three. The Company has no continuing involvement in the disposed business.

The Company recorded $408,020 as income from discontinued operations for the year ended April 30, 2013. Additionally, the company recorded $3,183,786 of costs to dispose related to the provision of discounting the estimated receipt of the payment over the payment term. Net of the valuation allowance, the estimated receipt was recognized as current disposal receivable and long term disposal receivable of $7,094,403 and $20,921,811 respectively.

Sale of DaPing Coal Mine

With consideration of several factors including continuing development strategies, the Company made the determination to dispose of the DaPing Mine. On November 18, 2012, the Company decided to purchase two coal mines, which are LuoZhou and LaShu mines by making a swap of the 60% equity interest in DaPing mine and 98% equity interest in ZoneLin Coking Plant. The fair value of the 60% equity interest in DaPing is reasonably stated by the amount of approximately $ 23 million, including $0.5 million on assets write-up per fair value measurement. The Company has no continuing involvement in the disposed business.

Sale of ZoneLin Coking Plant

With consideration of several factors including continuing development strategies, the Company made the determination to dispose of the ZoneLin Coking Plant. On November 18, 2012, the Company decided to purchase two coal mines, which are LouZhou and LaShu mines by making a swap of the 60% equity interest in DaPing mine and 98% equity interest in ZoneLin Coking Plant. The fair value of the 100% equity interest in ZoneLin is reasonably stated by the amount of RMB 77,786,000 (approximately $ 12.4 million, including $2.7 million on assets write-up per fair value measurement). The Company has no continuing involvement in the disposed business.

29. On July 31, 2013, the Company held an analyst conference call to discuss the financial results for the fiscal year ended April 30, 2013. During the analyst conference call, Defendant Fong had the following Q&A exchange with an analyst:

<Q>: Do you at least, [indiscernible] (15:59). Can you at least comment on the trend from Q1 to Q4 in the coal washing? Can you give us any color on the trend?

**\<Fong\>**: Coal washing. The trend, I can tell you – the trend has been up. Hang on a second, let me grab a...

**\<Q\>**: Yeah. The coal washing at Hong Xing is not just to clarify?

**\<Fong\>**: Right. The coal washing in Hong Xing has been relatively steady year-over-year, 2012 to 2013. We washed about overall 77,000 tons out of the – in that segment and that compares to about 62,000 tons, 63,000 tons – excuse me, let me get the actual tons right. We went from about 400,000 tons to 470,000 tons year-over-year. That area has been a little more steady. I don't have the breakdown between the two, but I know because I would expect and I'll make sure of this, but I believe that's all the Hong Xing facility because it doesn't – those numbers exclude the Ping Yi mine, which was a split facility and they also – and Hong Xing would be the only facility that we would count separately. The DaPuAn mine washes only its own coal, so it tends to just get lumped in with its coal sales, not a separate breakout on washing. So, the bottom-line is, it is stronger than it was last year. It's mostly due to the fact that production in the area has been better and so the availability of coal has been better.

**\<Q\>**: Okay, all right, and I appreciate that, and just one final question here, Clayton, if I could, [indiscernible] referring back to the Hong Xing, would you consider that even in Q4 – excuse me, in Q1, in this current quarter that the – they are trending up at the Hong Xing Coal Washing Facility. Is that safe to assume from what you – from your answer – from your last answer?

**\<Fong\>**: Overall, I don't have the quarter-over-quarter number in front of me, but I do know that we've been trending up modestly on the coal washing side.

30. On August 19, 2013, the Company issued a press release entitled, "L&L Provides Strategic Update." Specifically, the press release stated the following in relevant part concerning the Hong Xing Washing Facility:

> The Hong Xing Washing facility is L&L's smaller coal washing plant located in Shezone County, Yunnan Province ("Hong Xing"). Over the past few months L&L management decided to wind down operations due to increased needs to capital expenditures. Management has decided Hong Xing will not be accretive to L&L in the long run and has stopped Hong Xing's washing operations. Hong Xing facility is to be sold or disposed to an interested buyer as soon as possible.

31. On September 9, 2013, the Company issued a press release announcing its financial results for the first quarter ended July 31, 2013. For the quarter, the Company reported net income of $13.4 million, or $0.27 diluted EPS and net revenues of $51.2 million, as compared to net income of $8.5 million, or $0.17 diluted EPS and net revenues of $39.4 million for the same period of the prior year.

32.     On September 9, 2013, the Company filed a quarterly report on Form 10-Q for the first quarter ended July 31, 2013 with the SEC, which was signed by Defendant Lee, which reiterated  the Company's previously announced quarterly financial results and financial position.  In addition, pursuant to SOX, the Form 10-Q contained signed certifications by Defendants Lee and Robinson, stating that the financial information contained in the 10-Q was accurate, and that they disclosed any material changes to the Company's internal control over financial reporting.

33.     The Form 10-Q stated the following in relevant part:

Sale of Ping Yi Mine

With consideration of several factors including continuing development strategies, the Company made the determination to dispose of the Ping Yi Mine. On April 30, 2012, the Company entered into an Equity Sale and Purchase Agreement with Mr. Zhang, the previous owner of Ping Yi Mine, whereby the company sold its 100% equity ownership interest in Ping Yi Mine for RMB $196,000,000, approximately US $31,000,000. The payment was agreed to take the form of receipt with payment in two parts, (1) through receipt of coal extracted from Ping Yi Mine subsequent to the disposal, including priority receipt of future coal from Ping Yi mine at a 5% discounted price compared to the market price until 70% of the payment is received; (2) through receipt of the use of Ping Yi Mine's washing facilities subsequent to disposal, including usage fees charged at a 3%~5% discounted price compared to the market price until 30% of the payment is received. The terms of the agreement state that full payment must be received within five years, and that 70% of total receipts must occur by the end of year three. As of July 31, 2013, the Company received total payment of $2,077,063 as coal washing facilities service.

The Company recorded $408,020 as income from discontinued operations for the year-ended April 30, 2012. Additionally, the Company recorded $3,183,786 of costs to dispose related to the provision of discounting the estimated receipt of the payment over the payment term (refer to Note 5 and 11).

Sale of DaPing Coal Mine

With consideration of several factors including continuing development strategies, the Company made the determination to dispose of the DaPing Mine. On November 18, 2012, the Company decided to purchase two coal mines, which are LuoZhou and LaShu mines by making a swap of the 60% equity interest in

13

DaPing mine and 98% equity interest in ZoneLin Coking Plant. The fair value of the 60% equity interest in DaPing is reasonably stated by the amount of approximately $ 23 million, including $0.5 million on assets write-up per fair value measurement. The Company has no continuing involvement in the disposed business.

Sale of ZoneLin Coking Plant

With consideration of several factors including continuing development strategies, the Company made the determination to dispose of the ZoneLin Coking Plant. On November 18, 2012, the Company decided to purchase two coal mines, which are LouZhou and LaShu mines by making a swap of the 60% equity interest in DaPing mine and 98% equity interest in ZoneLin Coking Plant. The fair value of the 100% equity interest in ZoneLin is reasonably stated by the amount of RMB 77,786,000 (approximately $ 12.4 million, including $2.7 million on assets write-up per fair value measurement). The Company has no continuing involvement in the disposed business.

34.     The statements referenced above in ¶¶ 17-33 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them that: (1) the Company improperly accounted substantial revenue from operations that were already shut down; (2) the Company claimed acquisitions and divestitures of various properties through swap transactions that never occurred through the exchange of assets it never owned in the first place; (3) the Company lacked adequate internal and financial controls; and (4) that, as a result of the foregoing, the Company's financial results were materially false and misleading at all relevant times.

**The Truth Emerges**

35.     On September 19, 2013, GeoInvesting published an article on Seeking Alpha accusing the Company "of defrauding investors by booking substantial revenue from operations that have been idled for quite some time." Moreover, GeoInvesting stated that "LLEN's string of acquisitions and divestitures of various properties over the last few years amounts to a bait and switch shell game where it claimed to come into possession of assets through swap transactions

14

that never occurred through the exchange of assets it never owned in the first place."

GeoInvesting stated the following:

### Revenue Misrepresentation

1. LLEN's Hong Xing Coal Washing Factory, accounting for 39% of fiscal 2013 revenues, has been shut down since 2012, according to interviews conducted in July 2013 by GeoInvesting investigators with the only remaining staff on site as well as local residents.
2. Hong Xing did not file or pay any taxes to the Shizong County Local Tax Bureau since June 2012, and paid minimal taxes to the Bureau in the first half of 2012, according to our research.
3. On July 31, 2013, the LLEN management team falsely claimed in its fiscal 2013 earnings conference call "...we've been trending up modestly on the coal washing side." However, twenty days later, on August 19, 2013, LLEN announced in a press release: "L&L to Dispose Hong Xing Washing Facility." GeoInvesting believes that LLEN's abrupt decision to dispose of its purportedly profitable and growing coal washing operation was triggered by LLEN's discovery of our ongoing investigation.
4. Similar to Hong Xing, LLEN's purportedly revenue producing ZoneLin Coking Plant was shuttered and demolished a few months prior to LLEN's claimed $12.4M sale/exchange of ZoneLin Coking Plant to Union Energy, according to interviews with local residents, workers, and a government official. (see below)
5. The government mandated decision to shut down the ZoneLin Coking Plant was first issued on June 6, 2012. On September 10, 2012 the demolition was scheduled.

### Acquisition/Ownership Misrepresentation

6. LLEN does not own the Hong Xing Coal Washing Factory according to officially chopped (sealed) SAIC records.
7. Officially chopped SAIC filings show that neither Union Energy nor LLEN own the DaPing mine and ZoneLin Coking Plant.
8. The demolition of the ZoneLin Coking Plant prior to its alleged swap to Union Energy casts doubt on LLEN's acquisition of the LuoZhou and LaShu mines. LLEN claims that it acquired the LuoZhou and LaShu mines from Union Energy through a November 19, 2012 "asset swap" transaction, whereby LLEN exchanged its 98% interest in the ZoneLin Coking Plant and its 60% interest in the DaPing mine for Union Energy's 95% interests in the LuoZhou and LaShu mines. We find it highly implausible that Union Energy would want to acquire the ZoneLin Coking Plant, valued by LLEN at $12.4 million, when the ZoneLin Coking Plant was in the process of being torn down.
9. The Chinese government assigned the right to consolidate the DaPing mine to another company (not Union Energy). According to local residents, Union Energy never acquired LLEN's 60% interest in the DaPing mine.

10. In addition to the above findings, we have referenced multiple pieces of evidence that have led us to conclude that the asset swap deal never occurred and that LLEN did not acquire, nor does it today own the LuoZhou and LaShu mines. Our evidence includes:

11. Current SAIC filings show that Union Energy owns the LuoZhou and LaShu mines. These SAIC filings have the official chop (seal) of the Guizhou SAIC.

12. Interviews of Union Energy management who all repeatedly assert that, while they are familiar with LLEN, Union Energy, not LLEN, is the owner of the LuoZhou and LaShu mines. Interviews with multiple LuoZhou and LaShu mine employees further confirm Union Energy's ownership and complete control over the day to day operations and coal sales.

13. Articles in local PRC newspapers and official government websites clearly show that Union Energy, not LLEN, acquired and owns the LaShu and LuoZhou mines.

14. Signage apparently recently erected at both mines bears Union Energy's name, not LLEN's.

15. Union Energy's participation in the Guizhou provincial mine consolidation process is ongoing and well documented. Union Energy was assigned to acquire the LuoZhou and LaShu mines in March 2013 and just finalized the acquisition of mining rights for both mines in August 2013.

16. The nominee who claimed to hold LLEN's equity ownership in the DaPuAn mine and SuTsong mine is an individual who appears not to exist.

17. LLEN made a misrepresentative statement regarding the legal status of the DaPuAn mine and SuTsong mine.

Our findings greatly help explain LLEN's complete lack of free cash flow and inability to service its accounts payable resulting in a $4,983,075 highly dilutive debt for equity exchange arrangement after creditors sued LLEN in the Superior Court of the State of California for the County of Los Angeles Central District. Most importantly, $800,000 of the dilutive issuance resulted from the exchange of obligations owed to Dickson Lee, LLEN's chairman. Effectively, Dickson Lee indirectly sued his own company and disclosed this fact only after reaching the settlement that occurred on August 14, 2013 and was buried in the proxy statement issued on August 16, 2013.

36.     On this news, the Company's stock plummeted $0.80 per share or more than 38%, to close at $1.27 on September 19, 2013.

## CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf a Class of all persons who purchased or acquired L&L securities during the Class Period (the "Class"). Excluded from the Class are defendants herein,

the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

38.     The members of the Class are so numerous that joinder of all members is impracticable.     Throughout the Class Period, L&L securities were actively traded on the NASDAQ/NASDAQ Bulletin Board.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by L&L or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

39.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

40.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

41.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    •     whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of L&L;

- whether the Individual Defendants caused L&L to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of L&L securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

42. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

43. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- L&L securities are traded in efficient markets;

18

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ/NASDAQ Bulletin Board, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold L&L securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

44. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## CLAIMS FOR RELIEF

## COUNT I

### (Against All Defendants for Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

45. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

46. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

47. During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of L&L securities; and (iii) cause Plaintiff and other members of the Class to purchase L&L securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

48.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for L&L securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about L&L's finances and business prospects.

49.     By virtue of their positions at L&L, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

50.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of L&L securities from their personal portfolios.

51.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of L&L, the Individual Defendants had knowledge of the details of L&L's internal affairs.

52.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of L&L.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to L&L's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of L&L securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning L&L's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased L&L securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by defendants and were damaged thereby.

53.     During the Class Period, L&L securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of L&L securities at

prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said shares, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiff and the Class, the true value of L&L securities were substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of L&L securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

54. By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

55. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act
### Against The Individual Defendants)

56. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

(a) During the Class Period, the Individual Defendants participated in the operation and management of L&L, and conducted and participated, directly and indirectly, in the conduct of L&L's business affairs. Because of their senior positions, they knew the adverse non-public information about L&L's misstatement of income and expenses and false financial statements.

(b)     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to L&L's financial condition and results of operations, and to promptly correct any public statements issued by L&L which had become materially false or misleading.

(c)     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which L&L disseminated in the marketplace during the Class Period concerning L&L's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause L&L to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of L&L within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of L&L securities.

57.     Each of the Individual Defendants, therefore, acted as a controlling person of L&L. By reason of their senior management positions and/or being directors of L&L, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause L&L to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of L&L and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

58.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by L&L.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Awarding compensatory damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

D.     Awarding rescissionary damages; and

E.     Awarding such equitable, injunctive or other relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury of all issues that may be so tried.

Dated:  September 23, 2013

Respectfully Submitted,

**POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS LLP**

By: _____
     Jeremy A. Lieberman
     Leslie F. Portnoy
     600 Park Avenue, 20th Floor
     New York, New York 10016
     Telephone: 212-661-1100
     Facsimile: 212-661-8665
     jalieberman@pomlaw.com
     lfportnoy@pomlaw.com

**POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP**
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Phone: 312-377-1181
Fax: 312-377-1184
pdahlstrom@pomlaw.com

*Counsel for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1. I, Ron Buker, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against L & L Energy, Inc. ("L & L Energy" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3. I did not purchase or acquire L & L Energy securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4. I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired L & L Energy securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. To the best of my current knowledge, the attached sheet lists all of my transactions in L & L Energy securities during the Class Period as specified in the Complaint.

6. During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7. I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8. I declare under penalty of perjury that the foregoing is true and correct.

Executed  $9 - 19 - 13$
(Date)

_____
(Signature)

Ron Buker
(Type or Print Name)

**L & L Energy, Inc. (LLEN)**                    Buker, Ron

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 05/01/2013 | PUR | 1 | $3.7050 |
| 05/01/2013 | PUR | 24 | $3.7099 |
| 08/09/2013 | PUR | 185 | $2.7000 |